IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| JOHN MILANOVICH, | CV 19–55–BU–DWM |
| Plaintiff, | |
| v. | OPINION and ORDER |
| QUANTPOST, INC., a Foreign Profit Corporation, and LESTER W. DYE, individually, | |
| Defendants. | |

This action is a dispute between Plaintiff John Milanovich and Defendants Quantpost, Inc. and its CEO, Lester Dye, (collectively "Quantpost") over the termination of Milanovich's employment. (Doc. 61.) In essence, Milanovich was hired by Quantpost in March 2018 and, as part of his incentive compensation, was given two Stock Option Agreements. (*See* Doc. 60 at 2–3.) Following his termination in May 2019, the parties dispute the rights and obligations under their various employment contracts, focusing on if—or when—the Stock Options terminated. (*See id.* at 4–5.) Trial is set for April 26, 2021.

The Second Amended Complaint alleges four claims: a wage claim (Count I), a breach of contract claim related to the Stock Option Agreements (Count II), a wrongful termination claim (Count III), and a promissory estoppel claim (Count IV). (Doc. 61.) On the present motions, both Quantpost and Milanovich seek

1

summary judgment on the breach of contract claim (Count II), and Quantpost also

seeks summary judgment on the promissory estoppel claim (Count IV).  (Docs.

85, 86.)  Because of outstanding disputes of material fact, both motions are denied.

## LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  Facts are material if they have the potential

to affect the outcome of the case and there is sufficient evidence for a jury to return

a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247–48 (1986).  On cross-motions for summary judgment, it is the court's

"independent duty to review each cross-motion and its supporting evidence . . . to

determine whether that evidence demonstrates a genuine issue of material fact."

*Fair Housing Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132,

1137 (9th Cir. 2001).  Each motion is therefore evaluated separately, "giving the

nonmoving party in each instance the benefit of all reasonable inferences."  *Lenz v.*

*Universal Music Corp.*, 815 F.3d 1145, 1150 (9th Cir. 2016).

## ANALYSIS

## I.    Breach of Contract (Count II)

### A.    Contract Interpretation

In interpreting any contract, a "court strives to determine the parties' shared

intent, looking first at the relevant document, read as a whole, in order to divine that intent." *See Schuss v. Penfield Partners, L.P.*, 2008 WL 2433842, at *6 (Del. Ch. June 13, 2008) (internal quotation marks omitted).[1]  Contract terms are given their "common or ordinary meaning." *See Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *7 (Del. Ch. Dec. 22, 2010) (internal quotation marks omitted).  Likewise, contract provisions are interpreted as a whole, "giving effect to each and every term . . . in a manner that does not render any provision illusory or meaningless." *Id.* (internal quotation marks omitted).  If contractual language "is plain and clear on its face . . . the writing itself is the sole source for gaining an understanding of intent." *See Choupak v. Rivkin*, 2015 WL 1589610, at *18 (Del. Ch. Apr. 6, 2015) (quoting *City Inv. Co. Liquid. Tr. v. Cona Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993)).  But, if a "contract is . . . reasonably susceptible to two or more interpretations or may have two or more different meanings, then the contract is ambiguous and the courts must resort to extrinsic evidence to determine the parties' contractual intent." *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 852 (Del. 2019) (internal quotation marks, alteration, and footnote omitted).

In the summary judgment context, the moving party must demonstrate that

---

[1] Delaware law governs Milanovich's claims, save for the promissory estoppel claim.  (*See* Doc. 60.)

its interpretation of the contract is the *only* reasonable interpretation. *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. 2007). To defeat such a motion, the non-moving party need only show that its competing interpretation is *a* reasonable one. *Id.* at n.104. If two reasonable interpretations exist, then the contract is ambiguous, and a factfinder must assess the intent of the parties. *Id.* at 834; *Sunline*, 206 A.3d at 852. Here, because both parties' interpretations are reasonable, summary judgment is inappropriate.

**B.    Stock Option Agreements**

The parties' dispute centers on when Milanovich's Stock Options terminate, based on the language in both the Non-Statutory Stock Option Agreements ("Agreement"), (*see* Docs. 61-2, 61-3 at 1–7), and the attached 2014 Incentive and Non-Statutory Stock Option Plans ("Plan"), (*see* Docs. 61-2, 61-3 at 8–15).[2] The Plans are incorporated by reference in each Agreement and attached as "Exhibit A" following each Agreement. (*See* Agreement at ¶ 7.2.) Except for the stated "Expiration Dates"—which are August 1, 2021 and September 1, 2021, respectively—the Agreements and Plans are substantively identical.

The parties do not dispute the authenticity or enforceability of either Agreement, (*see, e.g.*, Doc. 95 at ¶¶ 6, 7), but present dueling views of when the

---

[2] Because of the identical language found in both Agreements and Plans, "Agreement" refers to information found on pages 1–7 of Docs. 61-2 and 61-3, and "Plan" refers to information found on pages 8–15 of Docs. 61-2 and 61-3.

options expire.  While each Agreement contains an "Expiration Date" on the first

page, Milanovich's termination triggered a provision in the Plan that provides:

> **Termination of Option.**  An option shall terminate three
> (3) months after termination of the optionee's employment
> or relationship as a consultant or director with the
> Corporation or an Affiliate, unless . . . (c) such termination
> is for cause, as define [sic] below, in which case the option
> shall terminate on the date of termination of the optionee's
> employment or relationship as a consultant or director
> with the Corporation or an Affiliate;[3] or (d) the option by
> its terms specifies either (i) that it shall terminate sooner
> than three (3) months after termination of the optionee's
> employment or relationship as a consultant or director, or
> (ii) that it may be exercised more than three (3) months
> after termination of such relationship with the Corporation
> or an Affiliate.

(Plan ¶ 7.2.)  According to Quantpost, because the Agreements do not explicitly

state that the options could be exercised more than 3 months after the termination

of Milanovich's employment relationship as required by ¶ 7.2(d)(ii), the options

terminated in August 2019, or three months after Milanovich was discharged.

Milanovich, on the other hand, counters that the stock options were extended under

¶ 7.2(d)(ii) by their stated "Expiration Dates" to August and September 2021.

Both positions find support in the contractual language at issue.  The Plan

states that an option lasts more than three months after an employee's termination

---

[3] The parties disagree whether Milanovich was fired for cause.  (Doc. 81 at 19, n.4.)  That issue, as well as whether Milanovich was an employee or independent contractor, are what the subject of the trial will be.  Obviously, if a jury finds that Milanovich was fired for cause, then this summary judgment issue will be moot.

only if it so specifies.  Because Milanovich was terminated in May 2019, this clause suggests that the Agreements expired in August 2019.  But the Agreements themselves provide specific "expiration" dates.  And, though the Agreements generally state that they are "subject to" the Plan, (*see* Agreement at ¶ 7.2), the "Expiration Dates" acknowledge only a maximum five-year limit, (*see id.* at ¶ 3.2). This necessarily implies they do not expire, regardless of the circumstances, until September and August 2021.  "So which governs, which controls? Both terms are clear in isolation; neither is more general or specific than the other[.]" *Sunline*, 206 A.3d at 847.  Nor do the rest of the contracts' terms resolve the dispute.  Thus, both parties present a reasonable interpretation of the Agreement terms. Considering this ambiguity and the absence of any extrinsic evidence in the current record, summary judgment on this question is denied.

## II.    Promissory Estoppel (Count IV)

Quantpost also seeks summary judgment on Milanovich's promissory estoppel claim, and in the alternative, dismissal of Dye as a defendant to the suit. Neither argument is compelling.

To prevail on his promissory estoppel claim, Milanovich must prove four elements: "(1) a promise clear and unambiguous in its terms; (2) reliance on the promise by the party to whom the promise is made; (3) reasonableness and foreseeability of the reliance; [and] (4) the party asserting the reliance must be

injured by the reliance." *Turner v. Wells Fargo Bank, N.A.*, 291 P.3d 1082, 1088

(Mont. 2012). Quantpost argues that Milanovich cannot show either (1) or (3).

However, viewing the evidence in the light most favorable to Milanovich, his

claim survives.

### A.     Promise

Under Montana law, "[t]he terms of the promise must be certain, as there

can be no promissory estoppel without a real promise." *Keil v. Glacier Park, Inc.*,

614 P.2d 502, 506 (Mont. 1980). Therefore, "promissory estoppel cannot be based

on preliminary negotiations and discussions or an agreement to negotiate the terms

of a contract." *Id.* In *Keil*, the Montana Supreme Court held that an "agreement to

agree" to rent a water pump did not go further than initial negotiations and

therefore did not rise to the level of a clear and unambiguous promise. *Id.* at 507.

Only one of the terms of the agreement was met: that the Keils would provide a

water pump. *Id.* No other terms—such as who was to provide fuel for the water

pump, or the rental rate for use of the pump—had been sorted out. *Id.*; *see also*

*Newman v. Lambert Sch. Dist. Nos. 4 & 86*, 2009 WL 10701662, at *5 (D. Mont.

July 9, 2009). In the absence of "[a]ll other material terms," further negotiations

were needed, and the first requirement of promissory estoppel was not met. *Kiel*,

614 P.2d at 507.

Here, Milanovich's promissory estoppel claim is based on discussions

between Milanovich and Dye on a spin-off of Quantpost in Chicago, aptly named "Quantpost Chicago." (Doc. 61 at ¶¶ 68–73.)  According to Milanovich, the parties agreed the business would be in Chicago, and Milanovich would run it. (Doc. 93 at ¶ 20; Addt'l ¶ 4–6.)  They also agreed that they would spin 90% of the actual and potential business in Quantpost into Quantpost Chicago, (*id.* at Addt'l ¶ 4), and Milanovich was promised 5% of the value of Quantpost Chicago and the ability to acquire an additional 8%, (*id.* at Addt'l ¶ 6(g)).  Milanovich then worked for three months to develop a business plan, complete detailed financial projections, target clients, and identify potential investors.  (*Id.* at Addt'l ¶¶ 7–8.) Although Milanovich admits there was much remaining to be done, (*see* Doc. 93 at ¶ 21), he presented more specific terms than those at issue in *Keil*.  Milanovich has therefore raised a genuine dispute of fact as to this issue.

**B.    Reasonable Reliance**

Quantpost further argues that even if its promise was specific enough, it was not reasonable for Milanovich to rely on it because he is a sophisticated businessman.  But Milanovich persuasively argues in response that Quantpost does not take the position that Milanovich *did not* rely on the promise, just that the reliance was not reasonable.  Reasonableness is generally a jury question. Moreover, the record shows that Milanovich worked without pay from January to May 2019.  (Doc. 81 at 7–8.)  A jury could find that he did so based on a

reasonable belief that he would receive the promised equity in Quantpost Chicago.

**C.    Dye**

Finally, Quantpost seeks to dismiss Dye as a defendant, arguing that he was acting solely in his capacity as CEO of Quantpost and cannot be held individually liable.  Milanovich once again presents sufficient evidence to raise a fact question as to Dye's capacity in his conversations with Milanovich about Quantpost Chicago.  (Doc. 93 at Addt'l ¶ 11.)

CONCLUSION

Based on the foregoing, IT IS ORDERED that the motions for partial summary judgment (Docs. 85, 86) are DENIED.

DATED this ⟋ day of April, 2021.

11:17 A.M.

Donald W. Molloy, District Judge
United States District Court